IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

JACOB JAMES KELLY,                        §
Institutional ID No. 02240439,            §
                                          §
          Plaintiff,                      §
                                          §
v.                                        §    CIVIL ACTION NO. 5:21-CV-175-BQ
                                          §
OLIVIA CAUDILLO, et al.,                  §
                                          §
          Defendants.                     §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Proceeding pro se and *in forma pauperis* (IFP), Plaintiff Jacob James Kelly filed this action

under 42 U.S.C. § 1983, claiming violations of his constitutional rights while incarcerated in the

Texas Department of Criminal Justice (TDCJ) Preston E. Smith Unit (Smith Unit). Compl. 4–6,

ECF No. 1.[1] He seeks monetary damages as well as injunctive and declaratory relief. *Id.* at 6.

Kelly signed his Complaint on August 15, 2021. ECF No. 1 (docketed Aug. 20, 2021).[2]

The United States District Judge subsequently transferred this action to the undersigned United

States Magistrate Judge to conduct preliminary screening in accordance with 28 U.S.C. §§ 1915

and 1915A. ECF No. 22. The undersigned thereafter reviewed Kelly's Complaint, as well as

authenticated records provided by TDCJ, and ordered Kelly to complete a questionnaire and

---

[1] Page citations to Kelly's pleadings refer to the electronic page number assigned by the Court's filing system.

[2] Under the "prison mailbox rule," courts consider an inmate's pro se pleading filed when it is delivered to prison authorities for mailing. *Spotville v. Cain*, 149 F.3d 374, 377 (5th Cir. 1988). Kelly's Complaint does not indicate the date on which he provided it to prison officials for mailing. For the limited purpose of determining the statute of limitations applicable to Kelly's claims, the Court treats Kelly's Complaint as filed August 15. *See Darby v. Dall. Cnty. Sheriff*, No. 3:06CV1928-K(BH), 2007 WL 2428582, at *3 (N.D. Tex. Aug. 24, 2007) (deeming plaintiff's complaint filed on the date he signed it).

supplemental questionnaire pursuant to *Watson v. Ault*, 525 F.2d 886, 892–93 (5th Cir. 1976), which he timely completed and returned. ECF Nos. 25, 26, 27, 31, 34, 35.

All parties have not consented to proceed before a magistrate judge. In accordance with the order of transfer, the undersigned makes the following findings, conclusions, and recommendation to the district judge.

## I.    **Standard of Review**

A court must dismiss a complaint filed *in forma pauperis* by a prisoner against a government entity or employee if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B) (2017); *see also* § 1915A(b) (applying section to any suit by a prisoner against certain governmental entities, regardless of whether the prisoner is proceeding *in forma pauperis*). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly fanciful or baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327; *Geiger v. Jowers*, 404 F.3d 371, 373 (5th Cir. 2005) (per curiam). When analyzing a prisoner's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated prison records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (explaining that responses to a questionnaire or testimony given during an evidentiary hearing are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam) (holding that courts may dismiss prisoners' *in forma pauperis* claims

as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

## II.    Discussion

### A. Kelly's Allegations and the Procedural History

Kelly identifies fifteen Defendants, all employees of the Smith Unit: (1) Lieutenant Olivia Caudillo; (2) Major David Dyer; (3) Assistant Warden Cody Parker; (4) Lieutenant Charles Miller; (5) Unknown Office of the Inspector General (OIG) Investigator;[3] (6) Captain Vasquez; (7) Property Officer Garces; and (8) Eight Unknown Correctional Officers. Compl. 4–5.

Kelly's Complaint comprises a single paragraph asserting vague claims of discrimination, failure to protect, and loss of personal property. *Id.* at 6. In addition to his responses to the Court's initial questionnaire (ECF No. 26), however, Kelly filed a nine-page, typewritten declaration reciting detailed factual allegations, some against additional Defendants not previously identified and some asserting claims not raised in his Complaint. *See* ECF No. 27. The Court therefore ordered Kelly to complete a supplemental questionnaire regarding facts introduced in the

---

[3] In subsequent pleadings, Kelly indicates the OIG Investigator's surname is "Hunter." *See, e.g.*, ECF No. 26, at 5; ECF No. 27, at 6. For consistency, the Court refers to the OIG investigator using the designation provided in Kelly's Complaint. Compl. 4 (Unknown OIG Investigator).

declaration. ECF No. 31. The following discussion encompasses claims raised across Kelly's pleadings.

Kelly's constitutional claims arise from his interactions with prison staff as well as his fellow inmates, beginning on the first date he was housed at the Smith Unit—March 18, 2019. Decl. in Supp. of Questionnaire 1, ECF No. 27 [hereinafter Decl.]. Kelly identifies as "an openly bi-sexual and transgender offender, who is documented as so" in TDCJ's classification system. *Id.*; *accord* Compl. 6. According to Kelly, Defendants committed the following unconstitutional acts against him: discrimination, excessive force, failure to protect from personal harm, and deprivation of personal property based on membership in a protected class. Compl. 6; Decl. 1–6; *see* Questionnaire 1, ECF No. 26.

Kelly alleges on his first day at the Smith Unit he was assigned to C-Wing, "where [TDCJ] houses confirmed gang members, extortioners, assaulters, and the types of inmates that are typically victimizers or troublemakers." Decl. 1. Kelly contends Defendants housed him in C-Wing "specifically [to] put [him] in danger of bodily harm and victimization," because he is a "young (25 years old), effeminate [sic], passive individual." *Id.*[4]

Shortly after entering custody, Kelly asserts he began receiving threats from several members of the Aryan Brotherhood of Texas (ABT). *Id.* Kelly states that ABT member Dakota Porter "bragg[ed]" to Kelly about "hav[ing] a history of extorting sex offenders" and "demanded [Kelly] pay $50 in commisary [sic] items to" the ABT every two weeks. *Id.* at 1–2. Kelly contends

---

[4] According to public records, as well as authenticated records from TDCJ, Kelly began serving his current five-year prison sentence after pleading guilty to sexual assault of a child. When Kelly entered TDCJ, the Unit Classification Committee (UCC) assigned him to General Population Level 2 (G2)—the second lowest level of TDCJ custody (out of six)—which houses "offenders who may live in dorms or cells inside the security fence." *Offender Orientation Handbook* 6, TEX. DEP'T CRIM. JUST. (Feb. 2017), available at https://www.tdcj.texas.gov/documents/Offender_ Orientation_Handbook_English.pdf. "[O]ffenders who have assaultive or aggressive disciplinary records" are assigned to G5—the highest level of custody before entering administrative segregation. *See id.*

the ABT thereafter began continuously extorting him for his commissary purchases through death threats and a "promise[] to have [him] raped if [he] failed to pay." *Id.* at 2.[5]

Immediately following ABT's initial threats, Kelly alleges that he approached three guards and "told them that 5 gang members were threatening [him] with extortion, rape, and death . . . because [he is] gay . . . and transgender." Suppl. Questionnaire 1. Kelly avers the guards "began chuckling and the one that sounded nearest responded with 'Man up, then.'" *Id.*; *accord* Decl. 2.[6]

That evening, Kelly asserts his cellmate, Dante Woodberry, "raped [Kelly] orally and anally." Decl. 3. According to Kelly, Woodberry "is not a member of the Aryan Brotherhood," and instead "is a Gangster Disciple, and a black man." Suppl. Questionnaire 3. Woodberry purportedly told Kelly that an ABT member, whom Woodberry "refferred [sic] to . . . as his friend" paid Woodberry to rape Kelly. *Id.*; *see* Decl. 3. Though Kelly contends "[w]ithin a few days [he] filed a grievance about" the incident, he states that "it was never returned and nothing came of it," and Kelly did not otherwise report the alleged rape to anyone for several months. Decl. 3; Questionnaire 2–3.

A few weeks later, Kelly was moved to "climate controlled housing" in a different building. Decl. 3. Kelly asserts that he was assigned to the same cell as Dakota Porter, the ABT member who purportedly initiated his ongoing extortion. *Id.*; Suppl. Questionnaire 4. Kelly maintains that Porter paid Lt. Caudillo to house them together. Suppl. Questionnaire 4 ("Dakota confessed to me

---

[5] Kelly's phrasing is imprecise. While "extorting" implies the extortion actually occurred, his other allegations suggest these were merely extortion attempts—he does not make clear whether he complied with the demands or if the ABT merely *attempted* to extort him. *See, e.g.*, Decl. 2 (theorizing that ABT threatened "to have [Kelly] raped becuase [sic] [Kelly] initially resisted the threats of extortion"), 3–4 (explaining that Dakota "threatened to come kill [Kelly] if [Kelly] did not bring [Dakota] the demanded amount" but Kelly "had no means of getting him the items . . . so [Kelly] could not pay him at all"); Supp. Questionnaire 2, ECF No. 35 ("ABT were all threatening to extort me . . . ."). However, as noted below (*see infra* note 15), he pleads no specific facts in support of this conclusory assertion that demonstrate he provided *any* amount of money or property to the ABT as a result of its extortion attempts.

[6] When asked to describe the guards, Kelly responded that all three were male, two Latino and one white, but could not recall their names or other identifying features. Questionnaire 2; Suppl. Questionnaire 1.

that he paid Caudillo to have us moved in together."); Decl. 3. Kelly does not allege that Porter physically harmed him while they were housed together, and in August or September, Porter was moved to another wing but "made every attempt to continue the extortion." Decl. 3.

On October 22, 2019, Kelly alleges a correctional officer informed him he would be relocated to Porter's wing. *Id.* at 4; Suppl. Questionnaire 4. Kelly states he then "looked for help," found Lieutenant Charles Miller, "and proceded [sic] to tell him about the extortion, rape, and immediate threat of death in being moved to" Porter's wing. Decl. 4. Lt. Miller spoke to Lt. Caudillo, who allegedly ordered Miller to move Kelly anyway.[7] *Id.*; Suppl. Questionnaire 4. Miller returned and gave the order a second time. Suppl. Questionnaire 5. Kelly again refused, and "loudly stated that [he] wanted to speak to a high rank[ing official] and [wanted] a video camera to be present" out of fear for his safety. *Id.* Miller ordered Kelly to move one more time and threatened to use force if Kelly failed to comply. *Id.* Kelly again refused. *Id.* Kelly contends "Miller then assaulted" him by "pushing [Kelly] so hard that [his] head hit the wall." *Id.*; *see* Decl. 4. Kelly concedes he struck Lt. Miller as well, but maintains he did not "contact [Miller] at all until he had begun to assault" Kelly. Suppl. Questionnaire 8.

Kelly was taken to the infirmary following Lt. Miller's use of force, where a nurse "cleaned the blood off" and "checked for signs of concussion." *Id.* Kelly states he is "not aware of any diagnosis" resulting from the exam, and he was released from the infirmary after about thirty minutes. *Id.* Kelly immediately entered administrative segregation, where he claims he was prohibited from receiving the personal property he left in his previous cell "[f]or most of a week."

---

[7] Kelly refers to Defendant Miller in his Complaint as Lieutenant, and elsewhere as Officer. *Compare* Compl. 4, *with* Decl. 4. The authenticated records, which span several years, refer to Miller as both Sergeant and Assistant Warden— including when discussing the events of October 22. For clarity, the Court defers to the honorific provided in Kelly's list of Defendants. Compl. 4. Neither the pleadings nor authenticated records, however, make clear whether Lt. Caudillo outranked Lt. Miller during the period relevant to Kelly's claims.

Decl. 5.    Once returned, Kelly asserts his personal property "was in tatters," and that "[a]pproximatley [sic] $800 worth of . . . property was missing" because Property Officer Garces and five unknown officers "failed to secure" it, allowing other offenders to access the items.  *Id.*; Suppl. Questionnaire 10.    In addition to a list of various household items, Kelly contends the missing property included legal papers associated with "[t]his instant cause of action."  *Id.*; Decl. 8.  Kelly argues the deprivation of his legal papers violated his right to access the courts.  Suppl. Questionnaire 10.

According to the authenticated records, Lt. Miller filed a disciplinary report stating that Kelly assaulted him during the October 22 alleged use-of-force incident.[8]   Kelly argues that Lt. Miller "filed a disciplinary offense report in which he falsified or simply made up the charge against" Kelly, but also states that "[a]ny and all action [Kelly] took after Miller began assaulting [him] . . . was so taken because [Kelly] had no recourse"—seemingly acknowledging that he used physical force against Miller.  *Id.* at 7 (emphasis omitted); *see also id.* at 8 (conceding Kelly struck Lt. Miller but did not "contact [Miller] at all until he had begun to assault" Kelly).  The prison held a disciplinary hearing regarding the charge on October 30, where Kelly entered a plea of guilty and made a statement accepting responsibility for injuring Lt. Miller.  As punishment, Kelly lost temporary access to recreation, commissary, property, and phone time, and experienced a reduction in his line class.  Kelly did not lose good time credits; he is, however, facing state criminal charges for assaulting a public servant.[9]  *See id.* at 6, 8–9.

---

[8] The records include photographs of Lt. Miller's injuries, which depict a deep laceration and swelling near Miller's eye.

[9] Documents published by the 106th Judicial District Court of Dawson County, Texas, indicate that in January 2021, a grand jury returned an indictment against Kelly on a charge of "Assault on a Public Servant—Enhanced to 2nd Degree Felony."  The indictment charges Kelly with "intentionally, knowingly, or recklessly caus[ing] bodily injury to Charles Miller by striking Charles Miller with [Kelly's] hand," on October 22, 2019, despite "know[ing] that Charles Miller was a public servant," and "that Charles Miller was lawfully discharging an official duty to wit: supervising inmates at the Smith Unit."

Following the hearing, Captain Vasquez escorted Kelly back to his cell in administrative segregation. Decl. 5. Kelly avers Vasquez "dismissed the attending officer and took [Kelly] into [a] small dayroom," where Vasquez allegedly forced Kelly to his knees and required him to perform sexual acts while Vasquez made verbal threats. *Id.*; Suppl. Questionnaire 11.[10] Kelly acknowledges he did not report the alleged sexual assault, but contends that is because "Capt. Vasquez is [m]arried to Sgt. Krista Vasquez who was the Safe Prisons/[Prison Rape Elimination Act (PREA)] coordinator at that time." Suppl. Questionnaire 11.

Kelly contends his mother began "call[ing] the unit . . . around March [2020]" regarding Kelly's claims, and "one of the wardens at the time" assigned Major David Dyer to investigate his claims. Decl. 6. Kelly asserts that Maj. Dyer "failed to investigate the many illegalities and legal/procedural violations [Kelly] described to him," so in October 2020—approximately one year after Lt. Miller's use of force and Captain Vasquez's purported assault—Kelly's mother filed a complaint on Kelly's behalf to the PREA Ombudsman. Questionnaire 4; Decl. 6. The PREA Ombudsman and statewide OIG subsequently launched an investigation into Kelly's claims. *See* Decl. 6. Though Kelly contends his report contained all the information included in his pleadings, the authenticated records indicate his report was limited to the alleged rape by Kelly's cellmate, his altercation with Lt. Miller, and the purported failure of the remaining Defendants to prevent or address the events giving rise to his claims.

The records further show the PREA Ombudsman and OIG initially determined Kelly's claims were "unsubstantiated" due to his inability to identify the assailant, the lack of physical evidence, and the amount of time elapsed since the event. On October 22, 2020, however, Asst.

---

[10] In his Complaint, Kelly only alleges "Defendants ignored [his] pleas for protection when [he] notified them that he was being threatened with sexual assault and extortion *by other offenders*"—Kelly makes no mention of assault by a *correctional officer* until his questionnaire responses, signed April 1, 2022. Compl. 6 (emphasis added); *cf.* Questionnaire 3.

Warden Parker re-interviewed Kelly regarding Woodberry's alleged assault, and the OIG ultimately referred the case to a special prosecution unit, who submitted it to a grand jury. The grand jury declined to indict Woodberry, and the PREA Ombudsman closed the case. *See id.* at 9.

Kelly argues Asst. Warden Parker and Maj. Dyer, along with the unknown OIG investigator, violated his constitutional rights by failing to sufficiently investigate his claims or prevent his allegedly ongoing extortion. Questionnaire 4; Suppl. Questionnaire 11–13. Specifically, Kelly contends that Parker, Dyer and the OIG investigator "conspire[d] with all of the Defendants" by "fail[ing] to protect [Kelly] from the ABT and refus[ing] to investigate anything but the rape, denying [Kelly] due process." Questionnaire 5; *see id.* at 4; Suppl. Questionnaire 11–13.

As relief for his claims, Kelly seeks compensatory and punitive damages, as well as injunctive and declaratory relief. Compl. 6. Though not explicitly requested, Kelly appears to also seek criminal charges against each Defendant and members of the ABT. *See, e.g.*, Suppl. Questionnaire 12 ("All I wanted, all I want, is reasonable safety. Because even to this day, all of these state and federal crimes aren[']t even on the law enforcement radar.").

### B. Defendants Immune from Suit

Kelly seeks monetary damages and injunctive relief. Compl. 6. A suit against Defendants in their official capacities is simply another way of stating a claim against TDCJ, and therefore the State of Texas. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). It is well established that suits for monetary damages against state officials in their official capacities are barred both by state sovereign immunity and the

Eleventh Amendment, and therefore cannot succeed under § 1983. *See Almond v. Tarver*, 468 F.

Supp. 2d 886, 892–95 (E.D. Tex. 2006) (collecting authorities and holding that claim against state

official in his official capacity was barred by sovereign and Eleventh Amendment immunities);

*see also Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998) ("As an instrumentality of the state, the

TDCJ[] is immune from a suit for money damages under the Eleventh Amendment."). Thus, any

claim for monetary damages against Defendants in their official capacities should be dismissed.[11]

### C. Three Unknown Guards

#### 1. Failure to Protect

Prison officials have a constitutional duty to protect inmates from violence at the hands of

other prisoners. *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). Prison officials must guard

against current threats, as well as sufficiently imminent dangers that may cause harm in the future,

but not every injury caused by another prisoner gives rise to constitutional liability. *Farmer v.

Brennan*, 511 U.S. 825, 837 (1994) (explaining that "not . . . every injury suffered by one prisoner

at the hands of another . . . translates into constitutional liability for prison officials responsible for

the victim's safety"); *Horton v. Cockrell*, 70 F.3d 397, 400–01 (5th Cir. 1995).

To state a viable constitutional claim for failure to protect, a plaintiff must show: (1) he

was subjected to conditions posing a substantial risk of serious harm; and (2) prison officials were

deliberately indifferent to his need for protection. *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir.

1995). Deliberate indifference "is an extremely high standard to meet" (*Domino v. Tex. Dep't of

Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)), and prison officials act with such indifference

only if they know an inmate faces a substantial risk of serious harm *and* they disregard that risk

---

[11] An additional basis for dismissal of these claims is that neither a state nor its officials acting in their official capacities are "persons" under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989).

by failing to take reasonable measures to alleviate it. *See Farmer*, 511 U.S. at 837. Consequently, officials' failure to alleviate a risk they should have perceived, but did not, does not constitute deliberate indifference. *See id.* at 837–38. Rather, the inmate must show that the official actually knew of and disregarded the excessive risk to inmate safety. *Id.* at 837. Thus, the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The known risk must be more than just some level of jeopardy and must be "excessive." *Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009).

####    a.   *The statute of limitations bars Kelly's claim.*

Kelly asserts the three unknown guards failed to protect him from a threat of rape and extortion by members of the ABT on or about his first day at the Smith Unit. Decl. 2; Suppl. Questionnaire 1–3; *see* Questionnaire 1–2. Specifically, Kelly states that he informed the officers of the threat "in unison" on March 18, 2019, and that his cellmate, Dante Woodberry, assaulted him that evening. Suppl. Questionnaire 1; Decl. 2–3. Kelly signed and submitted his Complaint on August 15, 2021. *See supra* note 2. Kelly's claims are barred by the statute of limitations.

Generally, a plaintiff's § 1983 claim is subject to the statute of limitations prescribed for tort claims in the state where the district court sits. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Because Kelly has filed suit in Texas, he has two years from the date he learns of facts giving rise to his § 1983 claim to pursue that claim in federal court. *Id.*; *Meyer v. Coffey*, 231 F. Supp. 3d 137, 145–46 (N.D. Tex. 2017); *see* Tex. Civ. Prac. & Rem. Code § 16.003. "A plaintiff need not know that [he] has a legal cause of action; [he] need know only the facts that would ultimately support a claim." *Piotrowski*, 237 F.3d at 576.

Kelly's claim that three unknown guards failed to protect him from sexual assault on March 18, 2019, accrued more than two years prior to the date Kelly submitted his Complaint, and therefore falls outside the statute of limitations for § 1983 claims. *Id.* Under these facts, Kelly's failure-to-protect claim against three unknown guards is *per se* barred by the statute of limitations.

> ### b. *Kelly fails to allege the three unknown guards were subjectively aware of and disregarded a substantial risk that Kelly would be assaulted by his cellmate.*

Even if the Court does not apply the statute of limitations to Kelly's failure-to-protect claim, it nevertheless fails on its merits. According to Kelly, he informed the three unknown guards that members of the ABT, a white supremacist gang, were threatening him with extortion, rape, and death due to his gay and transgender status. Suppl. Questionnaire 1–2; Decl. 2 ("I said 'gay' [rather than bisexual] because in prison, anybody who is partially homosexual is simply gay according to all."). Kelly avers he was thereafter assaulted by his cellmate, "a black man" who "is not a member of the Aryan Brotherhood," but instead belongs to a different gang. Suppl. Questionnaire 2. In essence, Kelly argues he informed the three guards of a specific risk of sexual assault and was subsequently assaulted, but not by the individuals identified in Kelly's request for help.

Accepting as true that Kelly informed the unknown guards of the specific risk of harm posed by the ABT, he did not inform any Defendant that he faced a risk of sexual assault by his black cellmate. *See id.* at 3. Under these facts, Kelly's claim should be dismissed. *See, e.g., Ard v. Rushing*, 597 F. App'x 213, 219–220 (5th Cir. 2014) (per curiam) (affirming dismissal of female prisoner-plaintiff's claim that sheriff failed to protect her from sexual assault by male jailer despite previous reports of sexual misconduct by same guard, e.g., unfounded rumors of harassment and rape allegation not reported to sheriff, because "[t]hese incidents were . . . insufficient to place [sheriff] on notice that [guard] posed a substantial risk of serious harm to female inmates"); *Renee*

*v. Peralez*, No. 7:16-CV-281, 2017 WL 3335989, at \*17 (S.D. Tex. Aug. 3, 2017) ("[Plaintiff] has not alleged sufficient facts to allow the [c]ourt to reasonably infer that any of the . . . [d]efendants actually drew an inference that she would be or was being sexually assaulted by" the specific defendant who assaulted her); *see Coleman v. Tanner*, No. CIV.A.09-7346, 2010 WL 2009445, at \*9 (E.D. La. Apr. 27, 2010) ("A prison official's mere knowledge of vague threats against an inmate is not sufficient to make it clear to the official that such information presents a substantial risk of serious harm to the inmate."), *R. & R. adopted by* 2010 WL 2009081 (E.D. La. May 19, 2010). Indeed, if any Defendant was aware of a direct threat by members of the ABT, housing Kelly with a black offender affiliated with an unrelated gang would arguably be a reasonable response to such a threat.

Kelly's identified status requires no different result. He concedes that at the time of the purported assault he "was documented as [b]i-sexual but not as transgender" because "the guard at [his] initial intake told [Kelly] [he] would be safer that way." Decl. 2. Kelly contends he informed the three unknown guards of his transgender status, but no other prison officials or offenders were aware of this fact. *See id.* To the extent Kelly alleges his mere status as gay, bisexual, or transgender placed Defendants on notice of a heightened risk of harm, such claim fails. "[T]he mere fact that [Kelly] is transgender is insufficient to show liability under the U.S. Constitution for any assault [he] experienced." *Solis v. Barber*, No. 3:20-CV-00765-E (BT), 2021 WL 3434991, at \*4 (N.D. Tex. June 30, 2021) (internal quotation marks and citation omitted), *R. & R. adopted by* 2021 WL 3419703 (N.D. Tex. Aug. 5, 2021); *see Jacoby v. Carter*, No. 4:16-CV-0728-MHH-TMP, 2017 WL 2962776, at \*20 (N.D. Ala. May 1, 2017) ("[T]he plaintiff may not rely solely on his claims that he is a feminine, gay, smaller size white male to establish deliberate indifference."), *R. & R. adopted by* 2017 WL 2957822 (N.D. Ala. July 11, 2017). And while Kelly

contends he was housed with violent offenders and "assaulters" (Decl. 1)—presumably because he entered TDCJ due to a charge of sexual assault of a child—Kelly "does not allege that [he was] housed with inmates known to be predatory" towards transgender inmates. *Oakleaf v. Frawner*, No. 15-CV-0220 RB/SMV, 2016 WL 9777162, at *4 (D.N.M. June 2, 2016), *R. & R. adopted by* 2016 WL 10179304 (D.N.M. July 19, 2016). Nor does Kelly "allege[] any facts showing previous assaults against [him] or transgender inmates at the prison or the dangers faced by transgender inmates at the [Smith Unit] generally, much less under circumstances like those at issue here." *Solis*, 2021 WL 3434991, at *5; *Oakleaf*, 2016 WL 9777162, at *4 ("[Plaintiff] does not allege that there have been attacks on other transgender[] inmates at [the prison].").

Because Kelly has failed to plead facts showing he informed any Defendant of a substantial risk that his cellmate would sexually assault him, Kelly's claim that three unnamed guards failed to protect him should be dismissed.

### 2. Discrimination

Kelly alleges one of the three unknown guards to whom he reported the ABT's threats responded by telling him to "man up." Compl. 6. Kelly contends such a statement constitutes discrimination based on his bisexual or transgender status. Questionnaire 7. "Aside from the mental/emotional trauma," however, Kelly concedes he experienced no actual injury based on the statement. Suppl. Questionnaire 3. Kelly also contends that, in addition to "the statement, . . . [it was] also the unwillingness of all 3 to protect" Kelly that amounted to unconstitutional discrimination. *Id.*

"The Equal Protection Clause of the Fourteenth Amendment is essentially a mandate that all persons similarly situated be treated alike." *Rodriguez v. CHRISTUS Spohn Health Sys. Corp.*, 874 F. Supp. 2d 635, 650 (S.D. Tex. 2012) (citing *Qutb v. Strauss*, 11 F.3d 488 (5th Cir. 1993)). "Courts conduct an equal protection inquiry only if the challenged government action

14

classifies or distinguishes between two or more relevant groups." *Id.* (internal quotation marks omitted). Kelly argues Defendants treated him differently than other similarly situated prisoners based on his bisexual and transgender status, but cites only personal beliefs and conclusory reasoning in support. *See* Questionnaire 7 ("I specifically believe it played a part in my initail [sic] housing assignment [sic], extortion, denial of protection and subjection to cruel and unusual punishment . . . .").

Kelly cannot rely on his conclusory beliefs to support a claim of discrimination. *Priester v. Lowndes Cnty.*, 354 F.3d 414, 420, 424 (5th Cir. 2004)); *Wolber v. Round Rock Indep. Sch. Dist.*, No. 1:19-CV-602-AWA, 2020 WL 5026870, at *2 (W.D. Tex. Aug. 25, 2020) ("[A] plausible equal protection claim under § 1983 must allege specific facts that the plaintiff was treated differently from specifically identified, similarly situated individuals, and 'allegations that are merely conclusory will not suffice.'" (quoting *Priester*, 354 F.3d at 420 (alterations omitted))), *appeal dismissed*, 2021 WL 2555472 (5th Cir. Apr. 20, 2021). Kelly's subjective belief that Defendants' statements or conduct were based on a discriminatory intent, standing alone, cannot support an equal protection claim—especially considering Kelly identifies no other similarly situated individuals whom the unnamed guards treated differently. *See Wolber*, 2020 WL 5026870, at *2. Thus, "[t]o the extent, if any, that [Kelly] claims Defendants discriminated against him because he is transgender and bisexual, he cannot prevail," because his "conclusory allegation of discrimination does not suffice to state a claim for relief under" federal law. *Butler v. Holmes*, No. 7:18-CV-161-O, 2021 WL 3277442, at *9 (N.D. Tex. June 10, 2021) (citing *Coleman*, 858 F.3d at 309), *appeal dismissed*, 2022 WL 944701 (5th Cir. Mar. 29, 2022).

Kelly's argument that one unknown guard's statement that he should "man up" constitutes discrimination or harassment is similarly meritless. Compl. 6. It is well settled that "verbal abuse

by a prison guard does not give rise to a cause of action under § 1983." *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002) ("[C]laims of verbal abuse are not actionable under § 1983 . . . ."); *see Francis v. Turrack*, No. SA-12-CA-927-PM, 2014 WL 3687311, *5 n.48 (W.D. Tex. June 17, 2014) ("It is well-settled that complaints of verbal harassment or threats, unaccompanied by any physical abuse, do not give rise to a claim for relief under § 1983, regardless of whether they are couched in terms of 'harassment' or 'retaliation.'"). The unknown guard's statement, whatever its intent, is therefore insufficient to support a claim of discrimination under § 1983.

Moreover, Kelly's argument that the unnamed guards' purported discrimination caused him to be extorted or assaulted by the ABT cannot support a constitutional claim because personal involvement is a necessary element of a § 1983 claim. *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987). Kelly's allegation that "[b]y failing to protect [him], and acquiescing to the threats against [him], the 3 guards conspired to the acts [Kelly] was thereafter subject to" is insufficient to demonstrate personal involvement by any of the three unnamed guards in the ABT's alleged extortion and assault. Suppl. Questionnaire 3. In addition, and more fundamentally, it also appears that an isolated sexual assault, even by a state actor (which describes neither the ABT or Woodberry), does not violate the Equal Protection Clause. *See Rodriguez*, 874 F. Supp. 2d at 651 ("[T]he [c]ourt is unable to locate any Fifth Circuit case at the district or circuit level recognizing that a state actor's isolated sexual assault of an individual could constitute a violation of the Equal Protection Clause.").

Because Kelly "has presented only vague and conclusory allegations, based solely on his personal, subjective belief that he was treated differently than other similarly situated" inmates, Kelly's claim of discrimination against the three unknown guards should be dismissed. *Barnett v.*

*Shaw*, No. 3:11-CV-0399-L, 2011 WL 2200610, at *4 (N.D. Tex. May 18, 2011), *R. & R. adopted by* 2011 WL 2214383 (N.D. Tex. June 7, 2011).

### D. Lieutenant Caudillo

#### 1. Bribery

Kelly asserts that Lt. Caudillo failed to protect him from the risk of harm Kelly faced by being relocated to ABT member Dakota Porter's wing after the ABT allegedly paid Kelly's cellmate to assault him. Questionnaire 4. Specifically, Kelly maintains that Lt. Caudillo accepted a bribe from Porter to house him with Kelly. Suppl. Questionnaire 4.[12] The undersigned addresses the substance of Kelly's claim below; however, to the extent he seeks to have Lt. Caudillo criminally prosecuted for the alleged bribe, he cannot do so under § 1983.

Kelly cannot use a federal civil-rights action to pursue relief for an alleged state-law criminal violation. Kelly possesses no constitutional right to have someone criminally prosecuted, and he cannot enforce criminal statutes through a civil request for relief. *See Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990) (stating that there is no "constitutional right to have someone criminally prosecuted"); *Florance v. Buchmeyer*, 500 F. Supp. 2d 618, 626 (N.D. Tex. 2007) ("Simply, a private citizen cannot enforce criminal statutes in a civil action."). Accordingly, the district judge should dismiss Kelly's implicit request to initiate criminal charges or to provide him a remedy for an alleged violation of state criminal law.

#### 2. Failure to Protect

Kelly cannot establish that Lt. Caudillo unconstitutionally failed to protect him from a specific threat of harm. Kelly alleges no facts demonstrating that he reported the previous sexual

---

[12] Kelly alleges Lt. Caudillo initially accepted a bribe to place Porter and Kelly in the same cell in April 2019. Like his claims against the three unknown guards, Kelly's claim arising from the alleged bribe is likely barred by the statute of limitations. *Piotrowski*, 237 F.3d at 576. Even if it is not, the claim fails for the reasons explained below.

assault to Lt. Caudillo prior to his relocation, or its purported connection to the ABT. *See* Suppl. Questionnaire 4; Decl. 3. Kelly therefore cannot show that Lt. Caudillo was aware of a substantial risk to Kelly's safety by being housed with Dakota Porter. *See, e.g.*, *Dixon v. Valdez*, No. 3:11–CV–1139–D–BK, 2011 WL 4398305, at *1–2 (N.D. Tex. Aug. 4, 2011) (finding plaintiff failed to state viable failure-to-protect claim, where plaintiff did not "allege that [d]efendant and her staff were aware of any risk to [p]laintiff's safety prior to the November 2009 assault, or that they inferred any risk to [p]laintiff's safety"), *R. & R. adopted by* 2011 WL 4398280 (N.D. Tex. Sept. 21, 2011).

Kelly similarly fails to allege that inmate Porter physically harmed him after they entered the same wing; instead, Kelly contends Porter continued attempting to extort Kelly for commissary purchases under threat of death or serious harm. *See* Suppl. Questionnaire 4. Kelly's fear of attack, standing alone, does not give rise to a viable constitutional claim. *See, e.g.*, *Bass v. Blount*, No. 1:18CV75-RHW, 2019 WL 4197599, at *1 (S.D. Miss. Sept. 4, 2019) ("Although Plaintiff expresses a generalized fear of gang-affiliated members, the mere threat of violence does not by itself constitute a failure to protect."); *see also Brown v. Bufkin*, No. 1:17cv306-RHW, 2019 WL 3220002, at *4 (S.D. Miss. July 17, 2019) (reasoning that plaintiff's failure to convey "anything more than a generalized fear of gang-affiliated inmates" did not provide sufficient information to defendant such that defendant was aware of a substantial risk of serious harm). Without an actual injury resulting from Kelly's housing placement, his failure-to-protect claim against Lt. Caudillo fails. *See Taylor v. Dallas Cnty.*, No. 3:20-CV-3021-M-BK, 2021 WL 5774389, at *3 (N.D. Tex. Nov. 9, 2021) (recommending dismissal of prisoner's failure-to-protect claim because he alleged

nothing more than de minimis injury resulting from alleged attack), *R & R adopted* 2021 WL 5771216 (N.D. Tex. Dec. 6, 2021).[13]

For these reasons, the undersigned recommends the district judge dismiss any claim based on Kelly's generalized fear of harm associated with being housed on Dakota Porter's wing. *See Anderson v. Wilkinson*, 440 F. App'x 379, 381 (5th Cir. 2011) (per curiam) ("We have declined to find deliberate indifference where an official *should have* inferred a risk posed to an inmate, requiring proof that the official *did* draw such an inference." (internal quotation marks and citation omitted)); *Tabor v. Hooper*, No. 20-443-SDD-EWD, 2021 WL 4144324, at *3 (M.D. La. Aug. 19, 2021) ("Deliberate indifference requires a level of awareness of a specific risk based upon specific information, such that general knowledge of general dangerousness or the like is not enough to support a failure to protect claim."), *R. & R. adopted by* 2021 WL 4139143 (M.D. La. Sept. 10, 2021).

### E.  Lieutenant Miller

#### 1.  Failure to Protect

Kelly alleges Lt. Miller failed to protect him from harm by fulfilling Lt. Caudillo's orders to move Kelly to Parker's wing after they were separated.  Decl. 4; Questionnaire 5; Suppl. Questionnaire 4–6.  Kelly refused the order, however, resulting in a use of force and his placement

---

[13] Critically, Kelly fails to specify the amount of money or property the ABT actually extorted from him (if at all), or any physical injury resulting from the threats that purportedly followed the assault by his cellmate. *See* Suppl. Questionnaire 4 (alleging Lt. Caudillo "enabled and supported Dakota's and the ABT's *attempt* to extort [Kelly], which resulted in [Kelly] being extorted and his life being endangered," without providing specific facts in support (emphasis added)); *see also* supra note 5. Kelly's "allegations of being subjected to intimidation and extortion by other inmates, while indicative of a miserable situation, is not a dangerous condition" giving rise to a failure-to-protect claim. *Garcia v. TDCJ-CID Director*, No. H-09-0436, 2009 WL 2901522, at *3 (S.D. Tex. Aug. 28, 2009) (finding that prisoner's extortion claim failed to "allege facts showing that he is incarcerated under conditions posing a substantial risk of serious harm"). Moreover, because Kelly "has not alleged that he suffered any physical injury or that he faces any present risk of injury," related to Lt. Caudillo's conduct, "he is not entitled to" compensatory damages under the Prison Litigation Reform Act. *Id.* (citing *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999) (per curiam)); *see* 42 U.S.C. § 1997e(e).

in administrative segregation. Suppl. Questionnaire 4–6. Kelly therefore does not allege he was ultimately required to move to Porter's wing, or that Porter caused him actual injury, as a result of Lt. Miller's actions. Accordingly, Kelly's failure-to-protect claim against Lt. Miller should be dismissed. *See, e.g.*, *Taylor*, 2021 WL 5774389, at *3.

### 2. Excessive Use of Force

Kelly contends Lt. Miller used excessive force when Kelly refused to move to Porter's wing. Suppl. Questionnaire 4–6.

In *Heck v. Humphrey*, the United States Supreme Court held that a plaintiff seeking to recover damages for harm "caused by actions whose unlawfulness would render a conviction or sentence invalid" must first prove that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486–87 (1994). Where a favorable judgment in the civil rights action would "necessarily imply the invalidity of [a prisoner's] conviction or sentence" in his criminal case, the civil claim is barred unless the criminal conviction has been reversed or otherwise declared invalid. *Id.* In addition to actions for monetary damages, courts have subsequently applied the "*Heck* bar" to prisoners' claims for injunctive and declaratory relief. *Reger v. Walker*, 312 F. App'x 624, 625 (5th Cir. 2009) (per curiam) (noting that whether a plaintiff's claims are "for damages, declaratory judgment, or injunctive relief," they are not cognizable under § 1983 until plaintiff's conviction is overturned or otherwise declared invalid).

Kelly acknowledges, as confirmed by public records, that he faces a pending criminal charge in state court for assaulting Lt. Miller. Suppl. Questionnaire 8–9. To be convicted, a jury must find that Kelly physically attacked Lt. Miller while Miller was lawfully fulfilling his duties.

20

A finding in this Court that Lt. Miller used excessive force—i.e., *un*lawfully fulfilled his duties—

or that Kelly's assault on Miller was legally justified, would most likely invalidate Kelly's criminal

conviction. *See, e.g.*, *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656–67 (5th Cir. 2007)

(affirming district court's "ruling that [plaintiff's] excessive force claim was barred as a matter of

law because he was convicted of aggravated assault on a police officer" (internal quotation marks

omitted)).  In any event, because Kelly has not ultimately been convicted or pleaded guilty to any

criminal charge, the Court cannot ascertain at this time whether a finding of liability against Lt.

Miller in this action would in fact invalidate Kelly's ultimate criminal judgment.  *See id.* at 656

("There is no alternative pleading or theory of recovery that would allow this claim for excessive

force to proceed without interfering with the Texas proceeding against [plaintiff] for aggravated

assault on an officer.").

Accordingly, the undersigned recommends that the district judge stay Kelly's claim against

Lt. Miller until his criminal charges arising from the same event are resolved. *See id.*; *Wallace v.

Kato*, 549 U.S. 384, 393–94 (2007) ("[I]t is within the power of the district court, and in

accord with common practice, to stay the civil action until the criminal case or the likelihood of a

criminal case is ended."); *Daigre v. City of Waveland*, 549 F. App'x 283, 286 (5th Cir. 2013) (per

curiam) ("affirm[ing] the district court's dismissal of [plaintiff's] excessive-force claim under

*Heck* solely on the basis of [plaintiff's] allegations, because they necessarily challenge[d] the

validity of her conviction for resisting arrest"); *Busick v. City of Madison*, 90 F. App'x 713, 713–

14 (5th Cir. 1996) (finding the lower court should have stayed plaintiff's civil claims pending

resolution of his criminal proceedings because it was impossible to determine whether the civil

claims necessarily implicated the validity of any conviction or sentence the plaintiff had received

or might receive); *Mackey v. Dickson*, 47 F.3d 744, 746 (5th Cir. 1995) (determining that when

civil-rights claim challenges events underlying ongoing criminal proceedings, "[t]he court may—indeed should—stay proceedings in the section 1983 case until the pending criminal case has run its course, as until that time it may be difficult to determine the relation, if any, between the two").

## F. Officer Garces and Five Unknown Officers

Kelly alleges Officer Garces and five unknown guards deprived him of property by failing to secure the contents of his cell when Kelly was moved to administrative segregation. Decl. 5. Kelly asserts that such a failure constitutes a "taking" under the Fifth and Fourteenth Amendments. *See* Suppl. Questionnaire 10. Because legal papers associated with this civil-rights action were among the items allegedly lost or destroyed, Kelly also contends Defendants violated his right to access the courts. *Id.*

### 1. Access to Courts

The Court notes initially that plaintiffs generally have a constitutional right to access the courts. *Bounds v. Smith*, 430 U.S. 817, 828 (1977); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."). This right flows from the First Amendment, as well as the Fifth and Fourteenth Amendment's due process clauses. *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) (per curiam).

There is not, however, a "freestanding right" to access the courts. *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (requiring allegation of actual injury). Indeed, to prevail on an access-to-courts claim, a prisoner must demonstrate prejudice or harm by showing that his ability to pursue a "nonfrivolous," "arguable" legal claim was hindered by the defendant's actions. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002); *Johnson v. Rodriguez*, 110 F.3d 299, 310–11 (5th Cir. 1997); *Bohannan v. Griffin*, No. 4:11-CV-299-A, 2016 WL 3647625, at *13 (N.D. Tex. June 30, 2016) (citing *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996)). That is, a plaintiff must plead

facts demonstrating "an actual injury arising from this purported denial." *Day v. Seiler*, 560 F. App'x 316, 319 (5th Cir. 2014) (per curiam). Notably, "[t]he 'injury requirement is not satisfied by just any type of frustrated legal claim.'" *Foreman v. Bowles*, No. 3:01-CV-2117-G, 2003 WL 21730136, at *3 (N.D. Tex. Mar. 31, 2003) (quoting *Lewis*, 518 U.S. at 353). Instead, plaintiffs "must demonstrate that the lack of access has prevented him from filing or caused him to lose a pending case that attacks either his conviction or seeks to vindicate basic constitutional rights in a civil rights action under . . . § 1983." *Id.* (internal quotation marks and citation omitted).

Kelly argues he was deprived of unspecified legal papers associated with this case; he fails, however, to specify any harm caused by the alleged deprivation. *See* Suppl. Questionnaire 10 ("[The deprivation] adversely affected my ability to present evidence in support of the allegations in this case and it is theft. My property has intrinsic value." (emphasis omitted)). Thus, Kelly fails to allege that Defendants hindered his ability to pursue a nonfrivolous, arguable legal claim. *See Christopher*, 536 U.S. at 415. This deficiency is fatal to his claim. *Day*, 560 F. App'x at 319; *Foreman*, 2003 WL 21730136, at *3. Accordingly, Kelly's access-to-courts claim arising from the purported loss of legal papers should be dismissed.

### 2. Personal Property

Kelly alleges Defendants deprived him of "over $800" worth of personal property, including a typewriter, radio, books, headphones, clothing items, stationery, and miscellaneous home goods. Suppl. Questionnaire 10; Decl. 8. Kelly accedes, however, that he does not contend he was dispossessed of his property pursuant to a Smith Unit policy. Suppl. Questionnaire 9.

An official's actions—whether negligent or intentional—that result in a loss of property give rise to a state tort action rather than a federal civil rights claim. Indeed, a state actor's negligence that results in an unintentional loss of property does not violate the Constitution. *See*

*Simmons v. Poppell*, 837 F.2d 1243, 1244 (5th Cir. 1988) (per curiam); *see also Marsh v. Jones*, 53 F.3d 707, 712 (5th Cir. 1995) (concluding negligence is not actionable under § 1983); *Finley v. Garcia*, No. 5:17-CV-00198-C, 2017 WL 11519122, at *1 (N.D. Tex. Sept. 15, 2017) (citation omitted) ("Section 1983 is not a general tort statute and a claim of negligence will not support a federal civil rights action."). Here, Kelly does not specifically assert whether the property deprivation was negligent or intentional.[14] *See, e.g.*, Decl. 5; Suppl. Questionnaire 9–10. To the extent Kelly intends to allege that Defendants' negligence deprived him of his personal property, the district judge should dismiss his claim. *See, e.g.*, *Strouse v. Karl*, No. 4:09cv640, 2011 WL 4591952, at *9 (E.D. Tex. Aug. 26, 2011) (dismissing claim where inmate's "allegation that [defendant] lost certain items of [property] merely accuse[d] [defendant] of negligence"), *R. & R. adopted by* 2011 WL 4591943 (E.D. Tex. Sept. 30, 2011).

Similarly, an intentional deprivation of personal property does not state a viable constitutional claim if the prisoner has access to an adequate post-deprivation state remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Stauffer v. Gearhart*, 741 F.3d 574, 583 (5th Cir. 2014) (per curiam) (citations omitted) ("An inmate's allegation that his personal property was lost, confiscated, or damaged does not state a claim under 42 U.S.C. § 1983, even when prison officials acted intentionally."). Here, the State of Texas provides an adequate post-deprivation remedy for persons asserting claims such as those raised herein by Kelly—the filing of a lawsuit for conversion in state court. *See, e.g.*, *Murphy v. Collins*, 26 F.3d 541, 543 (5th Cir. 1994). Assuming, without finding, that Defendants wrongfully lost or failed to secure Kelly's property, as alleged, Kelly may have a cause of action in state court; however, he cannot pursue a federal

---

[14] Kelly does specify, however, that Defendants "failed to secure [his] property, leaving the vacant cell open," providing access for other inmates to steal his property. Decl. 5. That is, Kelly does not allege that Defendants confiscated or stole his property, but that other inmates did so. *Id.*

constitutional claim. *See, e.g.*, *Perez v. Tanner*, No. 3:17-cv-2846-N-BN, 2017 WL 7000283, at *4 (N.D. Tex. Dec. 22, 2017) (dismissing due process claim alleging the destruction of inmate's property because he had a state remedy), *R. & R. adopted by* 2018 WL 501601 (N.D. Tex. Jan. 19, 2018); *Parker v. Carter*, No. H–13–0365, 2013 WL 3157913, at *2 (S.D. Tex. June 20, 2013) ("There is no legal basis to a prison inmate's claim that his due process rights were violated when" defendants "seized or destroyed his photographs."); *Hall v. St. Tammany Par.*, No. 10–1872, 2010 WL 5558910, at *6–8 (E.D. La. Dec. 21, 2010) (finding that detainee could not state a constitutional claim based on the deprivation of personal property because the state provided an adequate remedy), *R. & R. adopted by* 2011 WL 63662 (E.D. La. Jan. 6, 2011).

In sum, Kelly cannot raise a constitutional claim based on Defendants' alleged negligent or intentional failure to secure his personal property. Accordingly, Kelly's property-deprivation claim should be dismissed. *See Cole v. Lafayette Par. Sheriff's Off.*, No. 10-0109, 2010 WL 2944436, at *6 (W.D. La. June 2, 2010) ("[T]he deprivation of [property] as alleged by the plaintiff, whether negligent or intentional is not actionable in this civil rights complaint because [state] law provides plaintiff with his remedy."), *R. & R. adopted by* 2010 WL 2952086 (W.D. La. July 22, 2010).

### G. Captain Vasquez

**1. Order to Answer: The undersigned recommends the district judge require Captain Vasquez to answer Kelly's claim of sexual assault.**

Kelly asserts that Captain Vasquez sexually assaulted him while escorting him back to administrative segregation immediately after Kelly's October 2019 disciplinary hearing. Decl. 5–6; Suppl. Questionnaire 8. Kelly states he did not report the assault at the time of the event because the individual to whom he would have reported the assault, PREA coordinator Krista Vasquez, is married to Captain Vasquez. Suppl. Questionnaire 11.

After considering the allegations in Kelly's questionnaire responses and accepting them as true, the undersigned finds Kelly has pleaded facts sufficient to survive preliminary screening and recommends the district judge order Captain Vasquez to file an answer, motion, or other responsive pleading to the Complaint. *Copeland v. Nunan*, No. 00-20063, 2001 WL 274738, at *2 (5th Cir. Feb. 21, 2001) (per curiam) ("[S]exual assaults against inmates by prison guards without lasting physical injury may be actionable under the Eighth Amendment as acts which are offensive to human dignity." (internal quotation marks omitted)); *Reel v. LeBlanc*, No. CV 19-838-JWD-SDJ, 2020 WL 3067273, at *6 (M.D. La. May 19, 2020) (finding sexual assault claim survived screening because "federal courts have recognized that . . . any sexual assault of a prisoner by a prison employee constitutes cruel and unusual punishment" (citation omitted)), *R. & R. adopted by* 2020 WL 3065298 (M.D. La. June 9, 2020), *appeal dismissed*, 2021 WL 2780207 (5th Cir. Feb. 19, 2021); *Lagarde v. Metz*, No. CV 13-805-RLB, 2017 WL 457654, at *4 (M.D. La. Feb. 2, 2017) (holding at bench trial that plaintiff's allegation of sexual assault constituted Eighth Amendment violation).[15]

### H. Asst. Warden Parker, Major Dyer, and Unknown OIG Investigator

Kelly contends Maj. Dyer, Asst. Warden Parker, and an unknown OIG investigator did not protect him from continued threats by the ABT, and failed to investigate his claims of wrongdoing by offenders and staff. Questionnaire 4–5. Kelly characterizes the failure as a conspiracy. He argues, for example, that because he "told Parker of all the claims" described in his pleadings (save

---

[15] Consistent with the Court's analysis on the claims previously discussed, the undersigned notes a limitations issue *may* exist as to this claim. Kelly did not provide specific facts supporting this allegation until he submitted his signed questionnaire responses April 1, 2022—more than two years after the events underlying the allegations. Questionnaire 3; Suppl. Questionnaire 11 ("I believe the date [of Cpt. Vasquez's alleged assault] was 10/30/19."). He did, however, identify Captain Vasquez as a defendant in his original Complaint, where he alleged "Failure to Protect/Cruel Unusual Punishment," and that "[a]s a result of the Defendants' actions and inactions, Plaintiff was subjected to being raped . . . ." Complaint 5–6. Liberally construing these allegations in Kelly's favor, as the Court must in the screening phase, any issue in this regard can best be resolved after further development of the record. Nothing in this recommendation constitutes an adverse finding as to Captain Vasquez's alleged conduct.

for that against Captain Vasquez) and Parker subsequently did not investigate, Parker "has conspired with every Defendant herein" and is responsible for their wrongdoing. Suppl. Questionnaire 13.

Kelly states he complained to Defendants Parker, Dyer, and the unknown OIG investigator beginning in March 2020,[16] at which time Maj. Dyer was tasked with investigating the alleged events. Questionnaire 2; Decl. 6. Kelly asserts Defendants Dyer and Parker "helped to cover-up rather than investigate the rape, extortion, assault, sexual molestation, etc." Questionnaire 4. Elsewhere, however, Kelly acknowledges that prison officials opened an investigation into Kelly's allegation of rape by his cellmate and concedes Asst. Warden Parker "investigated" the assault, but argues "he spent the entire time trying to poke holes in [Kelly's] story and calling [Kelly] a liar." Decl. 6; Questionnaire 5 (alleging the OIG investigator "refused to investigate anything but the rape, denying [Kelly] due process").[17] In essence, Kelly concedes that Defendants investigated his claims; nonetheless, he maintains they did not do so in the method Kelly would have preferred and failed to provide the outcome or result—criminal charges or disciplinary action against the ABT—he desired. *See* Suppl. Questionnaire 12 ("[T]o this day, all of these state and federal crimes aren[']t even on the law enforcement radar."); *id.* ("I sought out protection because I was trying to have dangerous gang members criminally charged for rape, extortion, organized crime, recieving [sic] extortion proceeds, etc.").

---

[16] Kelly alleges he filed grievances in 2019—pertaining to the alleged rape and extortion—that were never returned, but he does not specify the individuals to whom he wrote the grievances, and no such grievances are contained in the authenticated records. *See* Questionnaire 2.

[17] The authenticated records include extensive reports pertaining to the PREA Ombudsman and OIG investigations into Kelly's rape allegations. Kelly's victim statement to the PREA Ombudsman contains facts describing only his cellmate's assault—it makes no mention of the alleged extortion, failure to protect, or any other claim described in his pleadings before this Court.

### 1.  Failure to Investigate

Kelly's claim that Defendants Dyer, Parker, and the OIG investigator failed to properly investigate his grievances and complaints of criminal activity fails to state a constitutional violation. "A prisoner has a liberty interest only in freedoms from restraint imposing *atypical* and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Geiger*, 404 F.3d at 374 (internal quotation marks and alterations omitted).  Because Kelly "does not have a federally protected liberty interest in having these grievances resolved to his satisfaction . . . , any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Id.*; *see Morris v. Cross*, 476 F. App'x 783, 785 (5th Cir. 2012) (per curiam) (rejecting appellant's claim that prison official's failure to conduct an adequate investigation into his grievance implicated due process concerns "because [appellant] lacks a protected interest in a favorable resolution to his grievances"); *Jackson v. Dunn*, 610 F. App'x 397, 398 (5th Cir. 2015) (per curiam) (affirming dismissal of plaintiff's claim that warden violated due process by failing to investigate claims against officials because a prisoner "does not have a constitutional right to have his grievance resolved in his favor or to have his claims reviewed pursuant to a grievance process that is responsive to his perceived injustices").

### 2.  Failure to Protect

Kelly's claim that Defendants Dyer, Parker, and the OIG investigator failed to protect him from ongoing threats by the ABT is meritless for the same reasons set forth as to Kelly's claims against Lts. Caudillo and Miller:  Kelly does not plead actual harm resulting from the alleged failure to protect. *See* Questionnaire 4–5; *Anderson*, 440 F. App'x at 381; *Tabor*, 2021 WL 4144324, at *3.  Because Kelly cannot establish that Defendants Dyer, Parker, and the OIG

investigator were deliberately indifferent to a substantial risk of harm, or that such harm actually occurred, Kelly's failure-to-protect claim against them should be dismissed.

## I.  Supervisory Liability

To the extent Kelly argues Defendants Caudillo and Parker "conspired" with the remaining Defendants because of their failure to prevent or remedy wrongs by their subordinates, Kelly's claim amounts to one for supervisory liability and is meritless.    Questionnaire 4; Suppl. Questionnaire 13–15.

Liability of government officials for the unconstitutional conduct of their subordinates cannot rest solely upon a theory of *respondeat superior* or vicarious liability.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) ("[S]upervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." (quotation marks and citation omitted)).  A supervisory official may be held liable only if: (1) he personally participated in acts that violated the plaintiff's constitutional rights; (2) a sufficient causal connection exists between his wrongful conduct and the constitutional violation; or (3) he implemented an unconstitutional policy that directly resulted in injury to the plaintiff. *See Thompkins*, 828 F.2d at 303–04.    In addition, a supervisory official may be liable if the supervisor either failed to supervise or train the subordinate official.  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

Kelly argues Defendants Parker and Caudillo are responsible for the wrongdoing of their subordinates because they did not prevent the wrongs from happening or investigate them properly once reported.   Because Kelly does not have a right to have his grievances investigated and resolved to his satisfaction, his claim can only survive if Kelly can project the alleged wrongs of the remaining Defendants onto Parker and Caudillo—he cannot.  *See id.*  Moreover, with the

exception of Kelly's sexual assault allegation against Captain Vasquez, the undersigned finds Kelly has failed to establish a viable constitutional violation as to any Defendant. Without an underlying wrong, Kelly is unable to state a claim against Parker and Caudillo for supervisory liability. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009) (holding plaintiff cannot state a claim for failure to train or supervise unless he establishes deliberate indifference); *Gibbs v. King*, 779 F.2d 1040, 1046 n.6 (5th Cir. 1986) ("There is no supervisory liability without primary liability.").

As to liability for Kelly's use-of-force claim against Lt. Miller, Kelly does not allege Miller operated pursuant to an official policy or that Defendants Parker or Caudillo were personally involved in the use of force. *See, e.g.*, Suppl. Questionnaire 13 (responding to a question asking if Kelly had any personal interaction with Lt. Caudillo by stating "[o]ther than her briefly looking at me and saying 'youre [sic] moving,' no"); *id.* (alleging Parker "conspired" with Miller and Caudillo by "mov[ing] [Kelly] in with Dakota, enabling extortion, then den[ying him] protection," without mention of use of force); *id.* at 4–5 (describing in detail Miller's alleged use of force). And concerning Kelly's surviving claim against Captain Vasquez, Kelly specifically states he did not file a grievance or inform any Defendant of Captain Vasquez's alleged sexual assault prior to filing this lawsuit. *See id.* at 8 ("I told [P]arker of ever damage done to me by every person . . . in this instant case, except for my claim against Capt. Vasquez."); *id.* (responding "No." when asked whether he reported the alleged assault to any prison official). Accordingly, Kelly's supervisory liability claims against Defendants Parker and Caudillo should be dismissed.

## III.   Recommendation

For these reasons, the undersigned recommends that the United States District Judge **ORDER** Captain Vasquez to answer Kelly's claim arising from Vasquez's alleged sexual assault,

**STAY** Kelly's claim against Lt. Miller for excessive use of force until Kelly's criminal charge(s) arising from the same event are resolved, and **DISMISS with prejudice** Kelly's remaining claims against all Defendants due to his failure to state a claim.

### IV.    Right to Object

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Findings, Conclusions, and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED.**

Dated: August *30*, 2022.

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE